CHARLES M. WOOLSEY,         )
           )
        Plaintiff,       )
           )
       v.         )     No. 2:17-cv-00271-JPH-DLP
           )
WILLIAM E. WILSON, *et al.*     )
           )
        Defendants.    )

## ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT AND DIRECTING FINAL JUDGMENT

Charles Woolsey, a federal inmate, brings this action pursuant to *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971), alleging that during his confinement at the Federal Correctional Center in Terre Haute, Indiana ("FCC Terre Haute"), he received constitutionally inadequate medical care for his injured knee. Mr. Woolsey contends that he requires a knee replacement, but has been denied one, and that he has not received appropriate treatment for the pain associated with his knee problems. Mr. Woolsey has sued Dr. William Wilson, Warden Stephen Julian, Christopher McCoy, Physician Assistant Genevieve Muscatell, Nurse David Decker, Andrew Rupska,[1] and Paul Laird.

Mr. Woolsey and the defendants have filed cross-motions for summary judgment. For the reasons discussed in this Order, Mr. Woolsey's motion for summary judgment is **DENIED**, dkt. [56], the defendants' motion for summary judgment is **GRANTED**, dkt. [61].

---

[1] Mr. Woolsey calls this defendant Hrupska, but the record reflects that the correct spelling of his name is Rupska. The **clerk shall amend** the docket to reflect the correct spelling.

# I. Summary Judgment Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. *See* Fed. R. Civ. P. 56(a). A disputed fact is material if it might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page,* 906 F.3d 606, 609-10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th

Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson*, 477 U.S. at 255. The fact that the parties have filed cross-motions for summary judgment does not change this standard or require a conclusion that no dispute of fact exists. *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers, Local Union 150,* 335 F.3d 643, 647 (7th Cir. 2003).

The only evidence Mr. Woolsey has designated in support of his motion for summary judgment and in response to the defendants' motion for summary judgment is his Verified Complaint. Because the Complaint is verified, the Court accepts the assertions in it as sworn evidence for purposes of the motions for summary judgment. *Beal v. Beller*, 847 F.3d 897, 901 (7th Cir. 2017) ("A verified complaint is not just a pleading; it is also the equivalent of an affidavit for purposes of summary judgment…."). Assertions in the Verified Complaint that are not based on personal knowledge but only on "information and belief", however, are not admissible evidence. *See Ferrell v. Mills*, No. 4:11-CV-018-SEB-TAB, 2012 WL 442806, at *1 (S.D. Ind. Feb. 10, 2012) (citing *Alpert v. United States,* 481 F.3d 404, 409 (6th Cir. 2007)).

As will be discussed in more detail below, Mr. Woolsey has failed to submit through the Verified Complaint specific facts to show that a reasonable jury would find in his favor because a party opposing summary judgment must "respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of

material fact for trial." *Grant*, 870 F.3d at 568. Inferences supported only by speculation or conjecture will not suffice. *Skiba*, 884 F.3d at 721-22. The nonmoving party must come forward with "specific facts showing that there is a *genuine issue for trial.*" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing Fed. R. Civ. P. 56(e) (emphasis in the original)); *see also Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017) ("Summary judgment is not a time to be coy: '[c]onclusory statements not grounded in specific facts' are not enough.").

## II. Statement of Facts

The following facts are undisputed for purposes of the motion for summary judgment. To the extent they were not disputed by Mr. Woolsey, the Court adopts portions of defendants' statement of undisputed material facts.

### A. Mr. Woolsey's Medical Condition Prior to BOP Custody

Mr. Woolsey has been incarcerated by the United States Bureau of Prisons ("BOP") since 2006. Dkt. 61-1 at 9. Before his incarceration, Mr. Woolsey injured his left leg in a car accident. *Id.* at 13. His femur was broken and the bone below his knee was crushed. *Id.* at 14. Also before being incarcerated, Mr. Woolsey had several major surgeries to his left leg. *Id.*

### B. Mr. Woolsey's Medical Treatment in BOP Custody

When Mr. Woolsey arrived at FCC Terre Haute, Dr. Wilson performed a new arrival physical. Dkt. 1 at 4, ¶ 15. Dr. Wilson and Chris McCoy both stated that Mr. Woolsey required a knee replacement. *Id.*, ¶ 17. Mr. Woolsey was also evaluated by Genevieve Muscatell in 2007. *Id.* at 5, ¶ 18. These defendants told Mr. Woolsey that they had requested that Mr. Woolsey receive a knee replacement, but they had not done so. *Id.*, ¶ 19. They later advised Mr. Woolsey that they would not submit a request for surgery because he was still able to ambulate. *Id.*, ¶ 21.

In April 2011, Dr. Wilson evaluated Mr. Woolsey during a chronic care visit and requested that Mr. Woolsey receive a consultation with an outside orthopedic surgeon for consideration of a possible knee replacement. Dkt. 61-3, ¶ 8. FCC Terre Haute is a Care Level 3 medical facility and cannot support post-surgical rehabilitation and physical therapy of the type that would be required after a knee replacement surgery. *Id.* Therefore, before a major joint replacement surgery is approved, the inmate must submit a request to the Office of Medical Designations and Transportation ("OMDT") for a transfer to a Federal Medical Facility ("FMC") once the inmate meets the BOP's Interqual guidelines (internal qualification requirements). *Id.* Dr. Wilson asked the outside specialist to look at several factors to assess Mr. Woolsey's condition under the Interqual criteria. *Id.*

Within four days, Mr. Woolsey was seen by an outside orthopedist, Dr. Ulrich, who suggested a knee replacement. *Id.*, ¶ 9. The OMDT denied the request, however, because Mr. Woolsey's BMI exceeded the level permitted by Interqual guidelines. *Id.* Specifically, his BMI was over 30. *Id.*, ¶ 17; Dkt. 61-4 at 9, 18.

From 2011 through early 2016, Mr. Woolsey continued to be seen by his primary care provider team, physical therapists, and at chronic care visits. Dkt. 61-3, ¶¶ 11-18. On March 1, 2012, Mr. Woolsey stated that he had no complaints and his medications were working well. Dkt. 61-3, ¶ 11. On March 2, 2012, he received a pair of specialty boots for his orthopedic issues. *Id.* On May 7, 2012, Mr. Woolsey was prescribed acetaminophen for his complaints of knee pain. *Id.*, ¶ 12. On May 10, 2012, he was seen by Hanger orthotics for new footwear and orthotics, including a lift for the left boot. *Id.*

On October 27, 2014, Mr. Woolsey saw PA Muscatell. Dkt. 61-4 at 5. Her notes say:

> Ortho recommends total knee replacement again. However, this was denied by region. They are recommending weight loss and get BMI to 30 as well as external joint support. Complains of ongoing left knee pain.

*Id.* Her notes also say she requested physical therapy for external joint support and scheduled him for weekly weight checks. *Id*. at 6.

On November 20, 2014, the staff physician, Dr. Bailey (who is not a party to this case), wrote that the previous requests for total knee replacement were denied due to obesity. Dkt. 61-3, ¶ 17; dkt. 61-4 at 1. Mr. Woolsey was seen by the physical therapist who also stated that Mr. Woolsey's knee replacement recommendations had been denied because he was overweight. Dkt. 61-3, ¶ 17. The physical therapist provided education about knee health. *Id.*

On February 12, 2015, Mr. Woolsey saw the physical therapist, who noted that he had not been approved for knee replacement surgery. Dkt. 61-5 at 62. Mr. Woolsey was provided a brace. *Id.*

While PA Muscatell treated Mr. Woolsey, she prescribed him different medications, including Effexor, Cymbalta, and Gabapentin to address his pain. Dkt. 61-15, ¶ 6. She attempted to prescribe narcotics, but that prescription was not approved. *Id.*

Mr. Woolsey was seen again by the staff physician, Dr. Bailey, on July 22, 2015, at which point it was noted that he had gained more weight. Dr. Wilson testifies that "it appears he was not a candidate for the knee replacement on this date as his BMI was above 30." Dkt. 61-3, ¶ 18.

On September 22, 2015, Mr. Woolsey saw PA Muscatell for his knee pain. *Id.*, ¶ 19; dkt. 61-5 at 40. She noted that he needed a left knee replacement, but it was deferred because of his weight and stated that she would "defer any decision for pain medication to the compound MD for review." Dkt. 61-5 at 40.

On October 9, 2015, Mr. Woolsey saw PA Muscatell for his knee pain. Dkt. 61-5 at 24. She noted that he had been prescribed Gabapentin, but that he reported that it was not helping much. *Id.* She noted that she would increase his Gabapentin prescription and place another knee replacement request. *Id.* Mr. Woolsey saw PA Muscatell again on October 29, 2015. *Id.* at 17. She again increased his Gabapentin prescription. *Id.*

On October 29, 2015, FCC-Terre Haute Health Services Department submitted a request that Mr. Woolsey be reconsidered for knee replacement surgery. Dkt. 61-3, ¶ 20; dkt. 61-5 at 26. The request was again denied by the OMDT because his BMI was too high. Dkt. 61-3, ¶ 20; dkt. 61-5 at 17. Medical staff informed Mr. Woolsey that his request could be resubmitted if his BMI was reduced. Dkt. 61-3, ¶ 20; dkt. 61-5 at 19, 24.

In April of 2016, Mr. Woolsey saw PA Muscatell for his knee pain and other health issues. Dkt. 61-6 at 40. He agreed to a trial of Cymbalta for his pain. *Id.*

In May of 2016, Mr. Woolsey submitted a request stating that he had lost weight and asking again for a referral for knee replacement. Dkt. 61-6 at 91. PA Muscatell replied that she could place another request when his BMI was below 30. *Id.*

In October 2016, the FCC Terre Haute medical staff was notified that BMI was no longer considered an Interqual criterion. Dkt. 61-3, ¶ 22. Accordingly, the staff physician sent another request for medical transfer on Mr. Woolsey's behalf. *Id.*; dkt. 61-6 at 9. In mid-2017, Mr. Woolsey was transferred to the Federal Medical Center – Lexington, Kentucky ("FMC"). Dkt. 61-6, ¶ 22. He filed this lawsuit on June 12, 2017. Dkt. 1. At the FMC, Mr. Woolsey underwent evaluation for his knee. Dkt. 61-9, ¶¶ 4-8. At the time the defendants moved for summary judgment, he had been approved for a consultation with a surgeon. *Id.*, ¶ 9. Mr. Woolsey recently reported that he had knee replacement surgery. Dkt. 73.

C. <u>The Defendants</u>

1. Sara Revell

Sara Revell was the Regional Director for the BOP's North Central Regional Office from June 2015 through her retirement in August 2018. Dkt. 61-10, ¶ 2.[2] As Regional Director, she was not involved in the day-to-day management of BOP institutions or of the medical care rendered at the institutions. *Id.*, ¶ 4. Ms. Revell has never received medical training and was not qualified to provide medical care to inmates or evaluate inmates regarding their medical care. *Id.* As Regional Director, Ms. Revell was not responsible for making decisions regarding medical transfers, the direct supervision of institution staff, or managerial oversight of the institution or staff training. *Id.*

Mr. Woolsey testified that he was "not sure" what Ms. Revell's job title was. Dkt. 61-1 at 25. When asked whether he had any evidence that Ms. Revell denied his surgery in 2015, Mr. Woolsey responded that she "doesn't seem to be a major player in my lawsuit" and he would "have to check [his] records." *Id.* at 28-29. He acknowledged that she "wouldn't have been actually a person that would have denied [the surgery]," *Id.* at 25, but he believes she would have "signed off on it" based "on a paper in one of my administrative remedies." *Id.* at 27.

2. Paul Laird

Paul Laird was the North Central Regional Office Regional Director before Ms. Revell, from April 22, 2012, through August 22, 2015. Dkt. 61-11, ¶ 1. Mr. Laird was not Regional Director when Mr. Woolsey's request for medical transfer was denied in October 2015 and lacked

---

[2] Mr. Woolsey objects to the affidavit of Teri Gregory which describes Ms. Revell's job duties. But Gregory's affidavit is made on personal knowledge and she is therefore competent to testify regarding Ms. Revell's job. Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").

any personal involvement in that decision. *Id.*, ¶¶ 1, 6, 8. Mr. Laird had no day-to-day interaction with inmates at the FCC–Terre Haute and did not make decisions regarding their medical care. *Id.*, ¶ 5.

Mr. Woolsey testified that he does not know whether Mr. Laird had authority to decide whether he received knee replacement surgery or not. Dkt. 61-1 at 35.

### 3. Stephen Julian

Stephen Julian was the Complex Warden of the FCC – Terre Haute from October 22, 2015, through May 14, 2017. Dkt. 61-12, ¶ 1. In his role, Warden Julian did not treat patients or participate in clinical medical decisions and was not qualified to do so. *Id.*, ¶ 6. Warden Julian did not make decisions regarding whether an inmate needed surgery but deferred to the Health Services Department. *Id.* Warden Julian did not participate in decisions about Mr. Woolsey's medical care or pain management, which were clinical medical decisions. *Id.* He also did not refuse Wooley pain medication or participate in decisions regarding the prescription of pain medication. *Id.* Warden Julian did not deny or delay any outside medical consultations or surgery for Mr. Woolsey. *Id.*

When asked in his deposition why he sued Warden Julian, Mr. Woolsey responded, "[b]ecause he was the warden. It's like the chain of command." Dkt. 61-1 at 53. Mr. Woolsey also asserted that Warden Julian "signed off on administrative remedies without doing any research or he would have seen that what was going on was wrong and he would have corrected it." *Id.* at 54.

### 4. Andrew Rupska and Chris McCoy – Health Services Administrators

Defendants Andrew Rupska and Chris McCoy each served as Health Services Administrator (HSA) at the FCC–Terre Haute during the relevant time period. Dkt. 61-13, ¶ 2; Dkt. 61-14, ¶ 1. Mr. Rupska served in this position from April 7, 2013, through November 26,

2017. Dkt. 61-13, ¶ 2. After Mr. Rupska left, Mr. McCoy assumed the role and is currently the HSA at FCC Terre Haute. *See* dkt. 61-14, ¶ 1. The HSA position is administrative in nature and involves implementing and directing the administration of the Health Services Department at FCC Terre Haute. Dkt. 61-13, ¶ 5; Dkt. 61-14, ¶ 5. Specifically, the duties include supervising non-clinical personnel and overseeing staff scheduling, fiscal management, and records management. *Id.*

Mr. Rupska was not involved in any decisions related to whether Mr. Woolsey received surgery. *Id.* ¶ 6. Similarly, Mr. McCoy did not ever perform a physical examination of Mr. Woolsey or provide medical care to Mr. Woolsey. Dkt. 61-14, ¶ 6. Mr. McCoy was not involved in deciding whether Mr. Woolsey received surgery. *Id.*

When asked why he sued Mr. Rupska, Mr. Woolsey stated it was because Mr. Rupska "was the head of the medical department there." Dkt. 61-1 at 35. Although Mr. Woolsey believes Mr. Rupska "delayed and denied my medical issues," he is unsure "what his actual title was," believing that Mr. Rupska was "over the doctors and everybody." *Id.* at 36. Mr. Rupska only supervised non-clinical personnel at FCC Terre Haute. Dkt. 61-13, ¶ 5.

Mr. Woolsey stated that other than the allegations in his complaint and his medical records, he had "no additional information" supporting his claims against Mr. McCoy. Dkt. 61-1 at 52-53.

5. Dr. William Wilson

Dr. Wilson is a Medical Doctor who is employed at the FCC-Terre Haute, as the Clinical Director. Dkt. 61-3, ¶ 1. He has served in that capacity since June 2011. *Id.* In this position, he facilitates medical care and treatment for inmates housed there. *Id.* According to Mr. Woolsey's medical records, the last time Dr. Wilson examined or treated Mr. Woolsey was on April 1, 2011, during a chronic care visit. *Id.*, ¶ 8. At that visit, Dr. Wilson prescribed meloxicam for Mr.

Woolsey's knee discomfort and requested that he receive a consultation with an outside orthopedic surgeon for consideration of a possible knee replacement. *Id.* Dr. Wilson does not have the authority to decide which inmates receive surgery or a medical transfer, which is a decision made by the OMDT in Washington. *Id.*, ¶ 24.

6. Physician Assistant Genevieve Muscatell[3]

Genevieve Muscatell is a Physician Assistant with the United States Public Health Service ("PHS") who is assigned to the FCC–Terre Haute. Dkt. 61-15, ¶ 1. She has been employed by the PHS since April 29, 2016. *Id.* Before joining the PHS, PA Muscatell was employed by the BOP since August 25, 2013. *Id.*

7. Nurse David Decker

David Decker is a Registered Nurse who works at the FCC Terre Haute. Dkt. 61-16, ¶ 1. During the relevant time period, Nurse Decker had two contacts with Mr. Woolsey: on September 23, 2010, and September 27, 2016. *Id.*, ¶ 4. On September 23, 2010, Nurse Decker saw Mr. Woolsey for a complaint of a burn on his thumb and arm from a valve he turned, which is unrelated to his claims in this lawsuit. *Id.* On September 27, 2016, Nurse Decker did not see or examine Mr. Woolsey, but only reviewed his chart for medication refills then sent the chart to a medical doctor and physician assistant for their co-signature and approval. *Id.* Mr. Woolsey's medical records show that Nurse Decker has never examined or treated Mr. Woolsey for his knee issues. *Id.* Moreover, Nurse Decker was not involved in the decision to approve or deny Mr. Wooley's requests for surgery or a medical transfer, or what prescriptions he received for pain management. *Id.* ¶ 5.

---

[3] PA Muscatell was previously named Genevieve Daughtry. *See* dkt. 61-4 at 5.

### III. Discussion

Mr. Woolsey asserts Eighth Amendment medical care claims against the defendants. Mr. Woolsey seeks summary judgment arguing that the defendants ignored his need for surgery and treatment for his pain. Defendants seek summary judgment as well. Several of the defendants argue they are entitled to summary judgment because they were not involved in making decisions related to Mr. Woolsey's medical care.[4] Dr. Wilson and PA Muscatell argue that the treatment Mr. Woolsey received was within the standard of care and that they had no control over whether he received knee surgery or medical transfer.

A. Eighth Amendment Standard

The Eighth Amendment requires prison officials to provide humane conditions of confinement, including taking reasonable measures to guarantee the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To prevail on an Eighth Amendment deliberate indifference medical claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendants acted deliberately indifferent—they knew about the plaintiff's condition and the substantial risk of harm it posed, but disregarded that risk. *Id.* at 837; *Pittman v. Cty. of Madison*, 746 F.3d 766, 775 (7th Cir. 2014). "[C]onduct is 'deliberately indifferent' when the official has acted in an intentional or criminally reckless manner, *i.e.*, "the defendant must have known that the plaintiff 'was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done

---

[4] The defendants also seek summary judgment based on the statute of limitations on claims that accrued more than two years before Mr. Woolsey filed this lawsuit. But it is at least arguable that Mr. Woolsey's claims are based on "a numerous and continuous series of events" and therefore the doctrine of continuing harm may apply to allow him to bring all of his claims. *See Heard v. Sheahan*, 253 F.3d 316, 319 (7th Cir. 2001). The Court will therefore address the merits of Mr. Woolsey's claims.

so.'" *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (quoting *Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir. 1998)). Something more than negligence or even malpractice is required. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). "To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see Plummer v. Wexford Health Sources, Inc.*, 609 Fed. App'x 861, 863 (7th Cir. 2015) (holding that defendant doctors were not deliberately indifferent because there was "no evidence suggesting that the defendants failed to exercise medical judgment or responded inappropriately to [the plaintiff's] ailments"). "A medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.*

For purposes of summary judgment, the parties do not dispute that Mr. Woolsey's knee condition constitutes a serious medical condition. Instead, they disagree as to whether the defendants were deliberately indifferent to this condition.

B. <u>Defendants Who Were Not Responsible for Mr. Woolsey's Care</u>

The undisputed evidence shows that several defendants were not involved at all in Mr. Woolsey's care and therefore were not responsible for any delay in referring him for surgery.

"A defendant cannot be liable under *Bivens* on the basis of respondeat superior or supervisory liability, rather, there must be individual participation and involvement by the defendant." *Arnett v. Webster*, 658 F.3d 742, 757 (7th Cir. 2011) (citing *Ashcroft v. Iqbal*, 556

U.S. 662, 676 (2009)).  "[I]f a prisoner is under the care of medical experts, a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Arnett*, 658 F.3d at 755.  However, a non-medical official can be charged with deliberate indifference where he has "'a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Id.* Mr. Woolsey must demonstrate that the communication gave the non-medical defendant sufficient knowledge to alert him to "an excessive risk to inmate health or safety." *Id.*

Ms. Revell worked at the North Central Office in Kansas City, Kansas and had no direct involvement in the day-to-day medical treatment of inmates or the decisions to approve or deny a request for surgery or medical transfer. Dkt. 61-10, ¶ 4.  Mr. Woolsey acknowledged that Ms. Revell "wouldn't have been actually a person that would have denied [the surgery]," dkt. 61-1, at 25, but he believes she would have "signed off on it" based "on a paper in one of my administrative remedies," *id.* at 27.  However, basing liability on the existence of a "paper" sent to a senior official is "inconsistent with the personal responsibility requirement for assessing damages against public officials." *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982) (addressing 42 U.S.C. § 1983 claims); s*ee also Vance v. Peters*, 97 F.3d 987, 993-94 (7th Cir. 2000) (rejecting argument that "any prisoner communication to a prison official anywhere in the corrections hierarchy constitutes adequate notice to the official of a violation of the Eighth Amendment").  Mr. Woolsey has not designated evidence that Ms. Revell approved any decision to deny him treatment or that she was provided with information that would put her on notice of an excessive risk to his health. *See Vance*, 97 F.3d 987, 993 (7th Cir. 1996) ("The plaintiff still has the burden of demonstrating that the communication, in its content and manner of transmission, gave the prison official sufficient

notice to alert him or her to 'an excessive risk to inmate health or safety.'") (quoting *Farmer,* 511 U.S. at 837). Ms. Revell is therefore entitled to summary judgment.

Similarly, Mr. Laird worked at the North Central Office in Kansas City, Kansas and had no direct involvement in the day-to-day medical treatment of inmates or the decisions to approve or deny a request for surgery or medical transfer. Dkt. 61-11, ¶ 5. In the Verified Complaint, Mr. Woolsey generally alleges that after Ms. Revell denied his need for surgery, he appealed to Mr. Laird, who also denied his request for treatment. Mr. Woolsey has not, however, designated evidence showing that Mr. Laird approved any decision to deny him treatment or that he was provided with information that would put him on notice of an excessive risk to his health. *See Vance*, 97 F.3d at 993 (7th Cir. 1996). Accordingly, Mr. Laird is entitled to summary judgment.

Warden Julian also argues that he did not personally participate in the alleged denial of medical care to Mr. Woolsey. Warden Julian responded to Mr. Woolsey's grievance regarding his request for knee surgery. Dkt. 61-2. The response indicates that Warden Julian reviewed Mr. Woolsey's medical records and found that the surgery had been denied based on Mr. Woolsey's BMI. *Id.* Warden Julian is not a medical professional and was therefore entitled to rely on the opinions of medical professionals in providing Mr. Woolsey with medical care. *Arnett*, 658 F.3d at 755. Further, there is no evidence that Warden Julian was alerted to an excessive risk to Mr. Woolsey and ignored it. Accordingly, Warden Julian is entitled to summary judgment.

Mr. Rupska and Mr. McCoy also argue that they were not personally involved in Mr. Woolsey's medical care. Mr. Woolsey argues that Mr. McCoy and Mr. Rupska coerced him to drop his first BP-10 and they denied him pain medication. In support of this argument, Mr. Woolsey relies on statements in his complaint that Mr. McCoy and Mr. Rupska failed to refer him for knee surgery, *see* dkt. 1, ¶ 20, and denied or discontinued his pain medication, *see* dkt. 1, ¶¶

27, 31.   But these general assertions are insufficient to rebut the specific evidence presented by Mr. Rupska and Mr. McCoy that they were not involved in clinical care of patients. Dkt. 61-14, ¶ 6; dkt. 61-13, ¶ 7; *see Sommerfield*, 863 F.3d at 649 (conclusory statements are not enough to defeat summary judgment).   There is no evidence from which a jury could find that Mr. McCoy or Mr. Rupska were directly involved with Mr. Woolsey's medical care, much less that either was provided with information giving them notice of an excessive risk to his health.

Last, Nurse Decker contends that he was not deliberately indifferent to Mr. Woolsey's knee pain because he never treated Mr. Woolsey for it. Nurse Decker has presented evidence that he had contacts with Mr. Woolsey on two occasions – once to treat a complaint of a burn, which is unrelated to the claims in this lawsuit, and one time in which Decker reviewed Mr. Woolsey's chart for medication refills.  Dkt. 61-16, ¶ 4.  Mr. Woolsey has provided no specific evidence to support a conclusion that Nurse Decker was responsible for his treatment of his knee arthritis. His allegations that Nurse Decker refused to provide him with treatment is too general and vague to rebut this evidence.  *See Sommerfield*, 863 F.3d at 649 (conclusory statements are not enough to defeat summary judgment).

Because Mr. Woolsey has not designated evidence showing that Ms. Revell, Mr. Laird, Warden Julian, Mr. Rupska, Mr. McCoy, and Nurse Decker were involved medical care relating to Mr. Woolsey's knee, they are entitled to summary judgment on Mr. Woolsey's claims.

D. Deliberate Indifference by Treating Personnel

Dr. Wilson and PA Muscatell[5] argue that they were not personally involved in denying Mr. Woolsey's request for surgery or medical transfer.  Alternatively, they argue that even if they were

---

[5] PA Muscatell also argues that she is immune from any claims based on treatment after April 29, 2016, because she began working for the Public Health Service at that time and employees of the Public Health Service are immune from civil suit for damages for personal injury based on the "performance of medical,

involved, they are still entitled to summary judgment on Mr. Woolsey's claims because the treatment Mr. Woolsey received for his knee pain was within the standard of care. Mr. Woolsey argues that the defendants acted with deliberate indifference when they did not provide him a knee brace, did not adequately treat his pain, did not assist him with losing weight, and by delaying his surgery.

The undisputed evidence shows that defendants Wilson and Muscatell were not deliberately indifferent in providing Mr. Woolsey's care. The defendants have established through expert testimony that the care rendered by the Bureau of Prisons medical providers was within the applicable standard of care. Dr. Rodney Benner determined, based on his review of Mr. Woolsey's medical records, that the attempts at nonsurgical treatment of Mr. Woolsey's knee arthritis were within the applicable standard of care, including the decision to deny surgery based on Mr. Woolsey's BMI. Dkt. 61-17 at 1. According to Dr. Benner, it is "clear in the medical literature that high BMI patients receiving total joint replacements have higher risks of complications," making it appropriate to attempt to decrease BMI before surgery. *Id.* Dr. Benner also stated: "while I believe the interventions prescribed and denials were within the standard of care, I do believe there has been significant delay in the progression of his knee care. . . . [A]ll of these interventions should progress relatively quickly over the course of several months, which the caveat being the patient's ability to lose weight, an important factor in this case, which can take longer and is patient dependent." *Id.* Dr. Benner also found that the medications prescribed to Mr. Woolsey were within the standard of care for treating knee arthritis. *Id.* By showing that Mr. Woolsey's treatment was not the result of negligence, the defendants have shown that they were not deliberately indifferent to Mr. Woolsey's medical needs. *See Petties*, 836 F.3d at 728 (citing

surgical, dental, or related functions." 42 U.S.C. § 233(a). But the majority of the care PA Muscatell provided to Mr. Woolsey was before April 29, 2016, so the Court will address the merits of his claims.

17

*McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013) ("Deliberate indifference is not medical malpractice.")).

Mr. Woolsey argues that the defendants failed to give him a knee brace to treat his pain and, when they did give him a brace, they gave him the wrong kind of brace. But the defendants' expert considered Mr. Woolsey's contention on this point and still concluded that the care he received was appropriate. Dkt. 61-17 at 1.

Mr. Woolsey also argues that he did not receive adequate treatment for his pain. But again, the defendants' expert considered the pain medications that Mr. Woolsey received, stating:

> Woolsey's request for further pharmacologic intervention is understood and appreciated. However, further pharmacological intervention would likely have required narcotic pain pills. Those are not recommended for knee arthritis chronic management as they could lead to tolerance (needing more medicine for the same effect), addition, or difficulty with pain management postoperatively. This recommendation of avoidance of narcotic pain medication is supported by the American Academy of Orthopaedic Surgeons Clinical Practice Guideline for Non-Arthroplasty Treatment of Osteoarthritis of the Knee.

Dkt. 61-17 at 2. The record reflects that the defendants provided Mr. Woolsey with pain medication and tried different medications to relieve his pain. *See* dkt. 61-15, ¶ 6; dkt. 61-3; dkt. 61-5 at 17, 24; dkt. 61-6 at 40.

Mr. Woolsey points out that other providers have provided him with narcotic pain medication, but PA Muscatell has shown that she attempted to prescribe him with narcotics and her requests were not approved. Dkt. 61-15, ¶ 6. Moreover, the fact that other providers have given Mr. Woolsey narcotics is insufficient to show that the failure to do so was the result of deliberate indifference because a difference of opinion even between medical providers is insufficient to show deliberate indifference. *Pyles*, 771 F.3d at 409 ("Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation.").

Next, Mr. Woolsey challenges the expert's opinion because he had not been able to review his radiographs. But the expert based his opinion on the assumption that Mr. Woolsey's "arthritis is severe." Dkt. 61-17 at 2. Mr. Woolsey has presented no evidence or argument to support a conclusion that, since the expert assumed that his condition is severe, being able to review the radiographs would have changed his opinion.

Mr. Woolsey also argues that the defendants were deliberately indifferent because he did not receive assistance in losing weight to allow him to reach the required BMI. But the defendants have shown that they provided him counseling on what to eat, dkt. 61-3, ¶ 15, scheduled weight checks, dkt. 64-15, ¶ 6, and referred him to a dietician, *id.*, ¶ 21. There is no evidence in the record that would permit a reasonable jury to conclude that the defendants should have done anything further to assist Mr. Woolsey in his weight management.

Mr. Woolsey argues that defendants used the wrong BMI criterion to determine his eligibility for surgery, but he does not point to any evidence in the record to support this assertion. Moreover, it is undisputed that Dr. Wilson and PA Muscatell requested knee surgery for Mr. Woolsey more than once and that those requests were denied by OMDT. Dkt. 61-3, ¶ 17; dkt. 61-5 at 24.

Mr. Woolsey also emphasizes the fact that the defendants' expert stated that there had "been a significant delay in the progression of his knee care." Dkt. 61-17. But each of the defendants who treated Mr. Woolsey have testified that they sought referrals for surgery but did not have the authority to approve or disapprove a surgery. Dkt. 61-15, ¶ 6; dkt. 61-3, ¶ 8. To the extent Mr. Woolsey argues that Dr. Wilson should be held liable for failing to request surgery in 2007, there is no reasonable inference that a failure to do so at that time was part of the "significant

delay" identified by the defendants' expert. Mr. Woolsey has presented no evidence to show that these defendants could have done more and failed to do so.

In summary, the defendants' designated evidence shows that the defendants did not fail to use medical judgment in making decision relating to Mr. Wooley's knee condition, and that they thus were not deliberately indifferent to Mr. Woolsey's medical condition. The designated evidence shows that Mr. Woolsey was examined regularly, given pain medication and a knee brace, and that requests for Mr. Woolsey to receive a knee replacement were denied. Defendants Wilson and PA Muscatell could not otherwise have ensured that he receive this surgery. Further, the expert testimony also shows that the defendants' treatment was within the standard of care. While Mr. Woolsey seeks summary judgment on his claims, he has failed to designate any evidence that defendants Wilson and PA Muscatell were deliberately indifferent towards his medical needs. Defendants Wilson and PA Muscatell are therefore entitled to summary judgment on Mr. Woolsey's claims.

### IV. Conclusion

For the foregoing reasons, Mr. Woolsey's motion for summary judgment, dkt. [56], is **DENIED** and the defendants' motion for summary judgment, dkt. [61], is **GRANTED**.

Mr. Woolsey's motion for the Court to take judicial notice and request for status, dkt. [73], is **GRANTED** to the extent that the Court takes judicial notice of the fact that Mr. Woolsey had his knee replacement surgery and that this Order provides Mr. Woolsey with the status of his case.

Judgment consistent with this Order and the Order of August 22, 2017 (dkt. 7) shall now issue.

**SO ORDERED.**

Date: 2/6/2020

*James Patrick Hanlon*

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

CHARLES M. WOOLSEY
07858-028
LEXINGTON - FMC
LEXINGTON FEDERAL MEDICAL CENTER
Inmate Mail/Parcels
P.O. BOX 14500
LEXINGTON, KY 40512

Shelese M. Woods
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
shelese.woods@usdoj.gov